# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 21-20048-CR-GAYLES/TORRES

UNITED STATES OF AMERICA

    Plaintiff,

v.

LEVARDO MORLEY,

    Defendant.

_____/

# REPORT AND RECOMMENDATION
# ON DEFENDANT'S MOTION TO SUPPRESS

This matter is before the Court on Levardo Morley's ("Defendant" or "Morley") motion to suppress incriminating statements he made on June 5, 2020, during an interview with law enforcement agents. [D.E. 52]. Morley argues that the statements made during his interview should be suppressed because the agents failed to deliver a *Miranda* warning in violation of the Fifth Amendment to the United States Constitution. The United States of America (the "Government") filed a timely response in opposition on October 3, 2022, [D.E. 57], to which Defendant did not reply. An evidentiary hearing was held on this matter on October 17, 2022. Therefore, the motion is now ripe for disposition.[1] After careful consideration of the motion, the Government's response, the evidence presented at the hearing, the relevant

---

[1] On September 22, 2022, Judge Darrin P. Gayles referred Defendant's motion to for disposition. [D.E. 54].

1

authorities, and for the reasons discussed below, Defendant's motion should be **DENIED**.

## I. FINDINGS OF FACT

At the evidentiary hearing the Government called one witness, Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF") Special Agent Carlos Perez. Defendant, Levardo Morley, took the stand and testified on his behalf. The parties did not introduce any exhibits at the hearing.

On March 2020, Morley purchased nine firearms from a gun store in Hialeah, Florida.[2] As required by law, the gun store provided notice of the transaction to the ATF, including providing a copy of the ATF form (Form 4473) that Defendant was required to complete to purchase the weapons. ATF analysts identified Defendant's purchase of multiple similar handguns as suspicious and began investigating the transaction.

On or about May 26, 2020, one of the nine guns Morley purchased in Hialeah (a Taurus G3 9mm) was recovered by Toronto policemen in Ontario, Canada, at the scene of a gang related shootout that resulted in three persons injured and one dead. Although the gun's serial number had been removed, Canadian authorities were able to recover it. On or about June 4, 2020, ATF agents in Miami were notified that the

---

[2] Defendant purchased: (i) two Glock, Model 26 Gen 4, 9mm caliber pistols, (ii) two Taurus, Model G3, 9mm caliber pistols, (iii) four Glock, Model 19 Gen 4, 9mm, pistols and (iv) one Glock, Model 19 Gen 5, 9mm caliber pistol. [D.E. 3 ¶ 4].

gun used in the shootout in Canada was one of the nine guns purchased by the Defendant.

The following day, on June 5, 2020, ATF agents went to Morley's home to speak with him about the nine guns he purchased in March. The agents arrived at Defendant's house in two unmarked government cars that were parked across the street from Defendant's property. Only two of the agents, ATF Agent Perez and U.S. Postal OIG Agent Cesar Roques, exited their car and walked towards Defendant who, at the time, was in the driveway outside his house retrieving something from his own vehicle. As they approached him, the agents asked Defendant if he was Levardo Morley, which he confirmed. Defendant then asked the agents, "how can I help you?" and upon realizing that Mr. Perez and Mr. Roques were law enforcement officers, Defendant spontaneously stated, "I've been meaning to report it."[3]

Once in close proximity to Morley, Agent Roques asked Defendant for his driver's license[4] and, after confirming his identity, Agent Perez advised Defendant that he wanted to verify the serial number of one of the Taurus, Model G3, guns that he purchased in March. Defendant stated that he still had the guns' original boxes, so the agents instructed Morley to bring them out. While the agents waited outside, Morley walked into his house unaccompanied, retrieved the two Taurus G3 boxes,

---

[3] The agents were wearing ATF polo shirts without body armor or other tactical clothes and maintained their holstered pistols, as well as their badges on their waistbands at all times. No siren alarms were employed, and the agents did not shout or used aggressive language toward Defendant.

[4] Defendant asserted that Agent Roques held on to this driver license for the entirety of the interview.

and brought the boxes back outside for the agents to see. This occurred about ten minutes after the encounter began.

Once he inspected the boxes of the Taurus G3 handguns, agent Perez confirmed that one of the serial numbers matched the serial number of the firearm used in the shootout in Canada. As the agents continued to question Morley about the guns, Morley told the agents that he had purchased the firearms to re-sell them to an individual known as Bobi and that he, in fact, sold them to Bobi three to four weeks earlier at a price of $500. Defendant described Bobi's appearance to the agents and further explained that his cousin had introduced him to Bobi.[5] The Government also alleges that Morley confessed that when he was selling the guns to Bobi, Bibi told him that he intended to erase the serial numbers of the firearms.

Sometime after Defendant explained that he had Bobi's telephone number written down on a piece of paper, the agents asked him to show that paper to them. At this point, Defendant went back inside his home unaccompanied, for the second time in a timespan of approximately 20 minutes, retrieved the piece of paper, and brought it out for the agents. The agents verbally warned Morley that dealing in

---

[5] Defendant contests this version of the facts. Defendant denied having the intent of re-selling the guns at the time of his purchase. Rather, he testified that he bought the guns to add them to his gun collection, and that he met Bobi at the gun show where he paid for the guns. Defendant did not recall specific dates during cross-examination, but he claimed that, at the show, Bobi wrote his phone number on a piece of paper and handed it to him so they could chat about attending a future gun show. Defendant testified that he only decided to sell the guns to Bobi because he was facing financial difficulties following termination form his former job.

firearms for profit without a Federal Firearms License was a crime, concluded the interview, and walked away from Defendant without arresting him.

In the following days, law enforcement obtained a search warrant to search Defendant's house, which was executed on July 2, 2020. The search yielded serialized boxes and cases with the same serial numbers belonging to the nine firearms that Defendant explained he purchased and then sold to Bobi.

Defendant was later charged by indictment on January 21, 2021, with violating 18 U.S.C § 922(a)(6) for knowingly providing false statements to a federal firearms dealer in connection with the purchase of the nine weapons. [D.E. 11].

## II.     APPLICABLE PRINCIPLES AND LAW

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In furtherance of the Fifth Amendment's mandate against self-incrimination, The Supreme Court requires trial courts to "exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel." *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010); *see Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, an individual is entitled to a *Miranda* warning only if he is in custody during questioning, and the Eleventh Circuit has described the test for determining whether an individual is in custody as follows:

> A defendant is in custody for the purposes of *Miranda* when there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. Whether [a defendant] was in custody [ ] depends on whether under the totality of the circumstances, a

> reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave. The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant. Under the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person.

*United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quotations, citations, alteration, and emphasis omitted).

A court should consider several factors in determining whether the defendant was in custody. *Howes v. Fields*, 565 U.S. 499, 509 (2012). One of those factors is "the location of questioning," for, although not dispositive, "courts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." *United States v. Matcovich*, 522 F. App'x 850, 851 (11th Cir. 2013) (emphasis in original) (quoting *United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006)). Other relevant factors include "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled[,]" *United States v. Barry*, 479 F. App'x 297, 299 (11th Cir. 2012) (quotation marks and citation omitted), "as well as the duration of the questioning, statements made during the interview, the presence of physical restraints during questioning, and 'the release of the interviewee at the end of the questioning.'" *Matcovich*, 522 F. App'x at 851 (quoting *Howes*, 565 U.S. at 509).

### III. ANALYSIS

Applying these principles to the facts of this case, we find that Morley was not in the custody of the ATF agents when he made the incriminating statements he now

seeks to suppress. Hence, the absence of a *Miranda* warning does not preclude admission of his statements at trial. Accordingly, Defendant's motion to suppress should be Denied.

As a threshold matter, we note that this record lacks most of the "salient features" of unconstitutional questioning that *Miranda* was designed to prevent; namely "incommunicado interrogation[s] of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warning of constitutional rights." *Miranda*, 384 U.S. at 445, 458-59 (guarding against the coercive effects of "isolation and unfamiliar surroundings" and their use by police to create intimidation and "extort confessions.").

Here, Defendant asserts that he was effectively under custody because the presence of the ATF agents outside his home created an atmosphere of oppression that deprived him of his freedom of action in a significant way. [D.E. 52 at 4-5]. However, the witness testimony proffered during the hearing and the evidence in record show otherwise. For starters, the Government's witness testified, and Defendant did not dispute, that the entirety of their exchange with Morley took place during broad daylight right outside his home, where Morley was retrieving something from his car when the agents arrived. At no point during his conversation with the two ATF agents was Morley asked to get inside one of the agents' vehicles, nor was Morley's access to his home restricted or physically blocked in any way by the agents. Indeed, Defendant was able to, and in fact did, walk inside his house unaccompanied amid the interview with the two agents, not one, but two times. Therefore, it is

7

undisputed that Morley "did not experience the 'sharp and ominous change' of circumstances associated with custody under *Miranda*, 'when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation in a police station' or another 'police-dominated atmosphere.'" *United States v. Woodson*, 30 F.4th 1295, 1306 (11th Cir. 2022) (quoting *Howes*, 565 U.S. at 511). Here, Morley was questioned by two agents just steps away from his home, during broad daylight, and in open view of any passerby or neighbor. These are facts that the Eleventh Circuit has repeatedly found to negate the existence of a custodial setting in police interrogations. *See, e.g.*, *United States v. Acosta*, 363 F.3d 1141, 1150 (11th Cir. 2004) (no custodial context where "[i]nstead of being detained in a remote area far from public scrutiny, [Defendant] was stopped in the parking lot of an apartment building in broad daylight."); *Woodson*, 30 F.4th at 1295 ("Rather than being whisked away to a remote and unfamiliar location, [Defendant] remained right outside his home and only steps away from his family."); *Luna-Encinas*, 603 F.3d at 882 (defendant not under custodial interrogation because "he was on familiar ground in his own front yard.").

      Defendant attempts to overcome these obstacles by alleging that, despite being outside his home, the ATF agents ordered him to not move. According to Defendant, Agent Perez "commanded Morley not to move, not to go anywhere, and that he had some questions for him." [D.E. 52 at 4]. The Government, on the other hand, firmly disputes the accuracy of this claim and denies that Agent Perez ever delivered such instruction to Morley. [D.E. 57 at 3]. But even if we adopted Defendant's version of

the events as true, his argument for custody would still fail, for as the Eleventh Circuit has repeatedly noted, "a [defendant's] seizure does not necessarily constitute custody for *Miranda* purpose." *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006). In other words, a seizure alone is not sufficient to trigger *Miranda*. Instead, the court must consider the "totality of the circumstances" and ask "whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Luna-Encinas*, 603 F.3d at 881.

Considering the totality of the circumstances, our case is a far cry from the interrogation settings that courts normally find amount to custodial detentions. The Government's witness credibly testified during the hearing that Defendant was approached by the two ATF agents right outside of his home, during broad daylight, and in plain view of any neighbor. Both agents wore polo shirts without any tactical vests, and at all times kept their firearms holstered. The agents' tone with Defendant was cordial and their exchange did not involve any hostility or tangible shows of force. Morley was not handcuffed, physically restrained, or even touched by any of the agents. Moreover, contrary to Morley's claim that he was deprived of his freedom of movement, Morley actually walked into his house unaccompanied and came back out in the middle of the interview while the agents waited outside. Indeed, Defendant was allowed to enter his house unaccompanied on two separate occasions: the first time so that he could retrieve *gun* boxes and the second time to get Bobi's number. Moreover, the interview was short, and Defendant was not arrested that day. Given

this record, the theory that the restraints imposed on his freedom of movement was tantamount to a custodial arrest simply is not persuasive.

And although Defendant claims that he "did not feel at liberty to end the questioning despite being at his residence[,]" [D.E. 52 at 5], his subjective belief is irrelevant for our custody assessment. *See Woodson*, 30 F.4th at 1304 ("Because the custody test is objective, we do not consider subjective beliefs"); *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000) ("[t]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.") (quotation marks and citation omitted). In light of the objective circumstances of Morley's interview with the two ATF agents here, we cannot say that a reasonable person in his shoes "would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Luna-Encinas*, 603 F.3d at 881.

Indeed, the facts of this case do not even come close to the degree of coerciveness, isolation, and show of force that courts in this Circuit associate with custodial interrogations. Rather, the facts in this record fall plainly in line with the kind of situation that the Eleventh Circuit and this Court have routinely deemed to be non-custodial interrogations. *See, e.g.*, *Acosta*, 363 F.3d at 1150 (seizure did not constitute custodial interrogation where questioning took place outdoors; defendant was "questioned after any weapons were quickly put back into their holsters"; "[Defendant] remained standing the entire time"; "[n]o physical force was used against him"; "[h]e was not handcuffed"; and "[h]e was not even placed in a police car at the time."); *Luna-Encinas*, 603 F.3d at 882 (defendant not under custody despite

10

being seized and ordered to remain quiet where "no one touched [defendant] or intimidated him verbally or physically"; "[n]o handcuffs were employed"; "no guns were drawn"; and "[defendant] was on familiar ground in his own front yard."); *Matcovich*, 522 F. App'x at 852 (interrogation was non-custodial despite taking place in a "police-dominated-atmosphere" because defendant was "in the familiar and comfortable surroundings of his home"; he "was not physically restrained during questioning"; "the agents' weapons were holstered when they spoke with [him]"; "[defendant] was free to go outside"; agents did not convey their "suspicion that [he] was a perpetrator"; and defendant "was not arrested until a later time.").[6]

We note that Defendant conceded at the hearing that the initial spontaneous statements he made to the agents when they first approached could not be suppressed under *Miranda*. We agree with that view as in *Miranda*, the Supreme Court expressly noted that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda*, 384 U.S. at 478. *See, e.g., Sullivan v. State of Ala.*, 666 F.2d 478, 482 (11th Cir. 1982)

---

[6] Defendant relies on a Northern District of Georgia case where the court ordered the suppression of testimonial evidence. *See United States v. Harrold*, 679 F. Supp. 2d 1336 (N.D. Ga 2009). We find that holding inapposite, however, because the circumstances of that interrogation were very different. Unlike our case, the interview in *Harrold* took place behind closed doors inside an interview room at a police station; defendant was locked inside the interview room for approximately forty-five minutes; defendant's wallet and identification were taken from her and were left outside the room; during the course of the interview, which lasted three hours, officers confronted the defendant with pictures placing her at the crime scene; and the defendant was arrested and taken to jail upon conclusion of the interview. *Id.* at 1340-41, 1344. Moreover, more recent Eleventh Circuit cases cited above preclude us from applying *Harrold* outside its unique factual setting.

(observing that "the protections of Miranda do not extend to voluntary statements made to law enforcement officers."); *Barry*, 479 F. App'x at 299 (affirming lower court's refusal to suppress "statements [ ] made voluntarily during a non-custodial interview.").

On the other hand, Defendant challenges all the reported statements he made after he retrieved the gun boxes at the agents' direction. From this point forward, Defendant maintains that he "submitted to SA Perez's intonation of authority" when he told Morley that he wanted to confirm the serial number of the guns, thus, rendering him under custodial interrogation at that point. [D.E. 52 at 5]. But Defendant does not provide us with any analogous authority that supports his claim. To the contrary, the Eleventh Circuit has expressly observed that an interviewee's "status as a suspect, and the 'coercive environment' that exists in virtually every interview by a police officer of a crime suspect, [does] not automatically create a custodial situation." *Muegge*, 225 F.3d at 1270; *see also United States v. Ewers*, No. 21-CR-20497-JEM, 2022 WL 1490271, at *11 (S.D. Fla. May 2, 2022), *report and recommendation adopted*, No. 21-20497-CR, 2022 WL 1487160 (S.D. Fla. May 11, 2022) (interview following execution of search warrant and carried out inside unmarked police car did not amount to a coercive environment necessitating *Miranda* warning). The facts that Morley was interviewed on the driveway of his own home, that no show of force or restraint was deployed by the agents at any time, and that Morley was allowed to walk unaccompanied into his home to retrieve gun boxes of all things, strongly cut against a finding of custody.

12

In sum, based on the undisputed facts, Morley's circumstances here fall well short of the threshold for us to find that his incriminating statements were spoken while he was in custody. Indeed, Morley's interview with the two ATF agents:

> did not involve the type of "highly intrusive" coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made. The totality of the circumstances were such that a reasonable person in [Morley's] position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else. No *Miranda* warnings were required at the time.

*Acosta*, 363 F.3d at 1150.

### IV. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Defendant's motions to suppress the testimonial evidence [D.E. 52] should be **DENIED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, good cause exists to expedite the objection period for this Report. The parties have **two (2)** days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge. The Court finds good cause to expedite the objection period to accommodate the current trial schedule. Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 17th day of October, 2022.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge